Warren E. GILLIAM, Jr.

v.

Major General K. L. REAVES, U. S. A. T. C., Commanding Officer, Ft. Polk, Louisiana.

No. 12279.

United States District Court
W. D. Louisiana,
Lake Charles Division.

Dec. 29, 1966.

Charles Morgan, Jr., and M. Laughlin McDonald, Atlanta, Ga., Benjamin E. Smith, New Orleans, La., for plaintiff.

Edward L. Shaheen, U. S. Atty., Q. L. Stewart, Asst. U. S. Atty., Shreveport, La., for defendant.

EDWIN F. HUNTER, Jr., District Judge:

Here, we are dealing with a habeas corpus applicant seeking release from restraint of Army officers who hold him as a member of the Armed Services. Petitioner's allegations are serious and their cumulative effect is that he is being denied basic rights guaranteed by the Constitution.[1] The crux of petitioner's contentions are two-fold: (A) that he never was inducted into the service, and (B) that the Army acted in an arbitrary, capricious and unconstitutional manner in denying him a discharge as a conscientious objector. Of import here is the sequence of events: (1) On June 17, 1964 he was classified 1A by his local draft board. No request was made for exemption. (2) On February 15, 1965 he was ordered to report for physical examination. (3) According to the records of the United States Army and Selective Service Board No. 9 (El Reno, Oklahoma), petitioner was inducted into the Army on October 12, 1965 at the Armed Forces Induction Station, Los Angeles, California. (4) On October 19, 1965, he arrived at Ft. Polk and was assigned to a unit for Base Combat Training. (5) During the initial training, petitioner acted as any other trainee and no problems were encountered. (6) On Thursday of the first week of training— October 29, 1965—weapons were issued to each trainee. Gilliam refused to accept a weapon, stating that he was a conscientious objector. He then, with the aid and assistance of pertinent Army personnel, submitted, his request for separation on the basis of his being a conscientious objector. (7) The request was recommended for disapproval by petitioner's chain of command and was finally denied by the Adjutant General on January 11, 1966. (8) This petition was filed on September 6, 1966.

## IS PETITIONER IN THE ARMY?

Petitioner insists that he has never been inducted into the Army as required by 50 U.S.C.A. App. § 462. It is conceded that he reported as ordered, but he states that he did not take "the step forward" and the attendant oath of induction.[2] The procedure in effect at the time of Gilliam's induction is marked Exhibit A and made a part hereof. Gilliam's assertion is that he was in an adjoining room and that he just did not step forward like the others. At the threshold, the Government takes issue with this assertion and refuses to concede its veracity. In the view we take of the matter, however, a resolution of this controversy is not necessary. This is true because one may emerge from a selectee to a soldier without taking the physical "step forward;" and he may do so by conduct consistent with the soldier status.[3] Gilliam raised the issue of his failure to take the "step forward" when he filed the present petition, ap-

1. Federal District Courts have jurisdiction over such applications. 28 U.S.C.A. § 2241.

2. Petitioner's allegation that he never took the oath of induction has no legal significance, inasmuch as such oath is not required (Para. 37(b) of Army Regulations 601–270).

3. Mayborn v. Heflebower, 5 Cir., 1945, 145 F.2d 864; Sanford v. Callan, 5 Cir., 1945, 148 F.2d 376; cf. Cox v. Wedemeyer, 9 Cir., 1951, 192 F.2d 920, 923–924.

proximately eleven months after his induction. He reported for induction, took and passed his examinations, reported to the inducting officer, and stood with his fellows during the induction ceremony. On the same day he signed a formal acknowledgement of his service obligation. He did not say to anyone that he would refuse to submit to induction or that he would not perform his duties as a soldier. Each step in the induction process he took willingly and voluntarily, except that now—eleven months later—he says he did not physically take the step forward during the ceremony. His compliance in all other respects with the procedure prescribed concluded the selective process and render him subject to military jurisdiction. It is manifest that the induction officers regarded Gilliam as a soldier at all times after the induction ceremony was completed, and that he voluntarily accepted the benefits and assumed the obligations incident to membership in the Armed Forces. The idea that a soldier's tenure in the service may be terminated at a later date by his simply stating, without any substantiating proof, that he did not take a physical step forward would sadly affect the war effort and is wholly foreign to the military concept in time of war. We conclude that Gilliam was actually inducted on October 12, 1965 and are of the further opinion that whether or not all formalities prerequisite to induction were observed, the subsequent conduct was such that any irregularities were cured.[4]

### DID THE DENIAL OF APPLICANT'S REQUEST FOR DISCHARGE DEPRIVE HIM OF BASIC RIGHTS GUARANTEED BY THE CONSTITUTION?

On October 29, 1965, Gilliam formally requested a discharge on the assertion that he was a conscientious objector. This request was recommended for disapproval by petitioner's chain of command and was finally denied by the Adjutant General's Department of the Army. Counsel for Gilliam vigorously argue that the record here reveals that the Army made membership in a church a determinative factor in their decision and thereby denied Gilliam full protection of the law of the land as set out in United States v. Seeger, 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965). With equal vigor counsel insists that the Army violated the free exercise and establishment clauses because its decision has the effect of making church membership and church attendance compulsory to the conscientious objector.

■ Insofar as we can ascertain, there are no reported cases involving a similar constitutional attack on a military denial of a conscientious objector status. Concededly, military service, like taxation, is a part of the price of civilization from which no one has a constitutional right to exemption. Exemption is a matter of legislative grace. Congress has, in accordance with longstanding policy, excused from "combatant training and service" any person who "by reason of religious training and belief, is conscientiously opposed to participation in war in any form." 50 U.S.C.A. App. § 456(j).

Selective Service Regulations provide that a claim for conscientious objector status must be made before the individual concerned has been notified to report for induction. United States v. Taylor, 351 F.2d 228 (6th Cir., 1965). The Army, too, has a related regulation which reads as follows:

"Requests for discharge will not be entertained when based solely on conscientious objection which existed, but was not claimed prior to induction, enlistment, or entry on active duty for training. Similarly requests for discharge will not be entertained when based solely on conscientious objection which was claimed and denied by

---

4. Decisions cited by petitioner are, on their facts, so different from the circumstances of the present case that they have no persuasive value on us. For example, Corrigan v. Secretary of Army, 9 Cir., 211 F.2d 293, which in dictum encourages our decision here.

the Selective Service prior to induction." AR 633–20, 3(b).

However, the Department of Defense has seen fit to relax these regulations and by Directive No. 1300.6, dated August 21, 1962, establishes for all personnel of the Armed Forces procedures for processing requests for discharge based on conscientious objection. That Directive was in effect at the time petitioner submitted his request for discharge and contains the following pertinent provisions:

"The standards used by the Selective Service System in determining 1–O or 1–A–O classification of draft registrants prior to induction are considered appropriate for application to cases of servicemen who claim conscientious objection after entering military service. 1–A–O classification permits induction into the military service and the inductee is required to perform duties as outlined in Section V.A. of this Directive. 1–O classification does not permit induction into military service but does not permit induction into the Alternate Service Plan (Conscientious Objectors' Work Program). In either of the classifications the registrant is required to fulfill his obligations under the UMT&S Act."

\* \* \* \* \* \*

"The criteria for determining conscientious objection (other than the statutory requirement that the objection be religious, as opposed to personal or philosophical are not absolute objective measurements which can be applied across the board, but are the result of extensive experience and practices which have been upheld in the Courts in connection with legal obligations for service. Among the factors considered are such items as membership in a peace church, training in home and church, the general demeanor and pattern of conduct of the individual, his employment in defense-connect-ed activities, his participation in religious activities, and his credibility and the credibility of persons supporting his claim \* \* \*."

\* \* \* \* \* \*

"While church membership and church tenets are relevant in determining conscientious objection, they are not compelling. The courts have held that mere membership in a religious group teaching conscientious objection is not an automatic basis for classification as a conscientious objector nor does membership in a group which does not require conscientious objection constitute an automatic basis for denying such classification. The law does not require affiliation with any particular group in order that an individual may be classified as a conscientious objector."

The fundamental constitutional assault on all fronts is pegged on, and its hope of success must rest upon, the premise that the language used by the Adjutant General in denying petitioner's request is proof that the Army in the instant case placed a premium upon church membership, thereby stepping over Mr. Jefferson's wall [5] and the law as set out in *Seeger*. This contention finds its basis in the following directive:

"1. The application for release as a conscientious objector submitted by Private Warren E. Gilliam, Jr., is not favorably considered.

"2. Private Gilliam is not a member of a religious organization or Sect and the evidence as presented does not warrant separation. In reaching this decision consideration was given to the opinion of the Director of the Selective Service System.

"BY ORDER OF THE SECRETARY OF THE ARMY:

"/s/ H. F. Wise
Adjutant General"

---

5. See Justice Frankfurter's concurring opinion in People of State of Ill. ex rel. McCollum v. Board of Education, 333 U. S. 203, 68 S.Ct. 461, 92 L.Ed. 649, wherein it is stated: "Separation means sep-aration, not something less. Jefferson's metaphor in describing the relation between Church and State speaks of a 'wall of separation,' not of a fine line easily overstepped."

Did the Army, in denying the conscientious objector status to Gilliam, place a construction on the statutory definition of "religious training and belief" that is contrary to the Supreme Court's holding in *Seeger?* We briefly review what happened there. Seeger claimed exemption as a conscientious objector under Section 6(j). His conscientious objections were based on a belief in and devotion to goodness and virtue for their own sake and a religious faith in a purely ethical creed. His local selective service board found his beliefs to be sincere and honest but denied his claim because it was not based upon a "belief in a relation to a Supreme Being." He refused to submit to induction and was subsequently convicted in a federal district court.[6] The Court of Appeals for the Second Circuit reversed on the grounds that the statute limiting the exemption to persons who believe in a Supreme Being violated the Due Process Clause of the Fifth Amendment by creating an impermissible classification.[7] The Supreme Court granted certiorari and affirmed the result, but did not pass on the constitutional issue, preferring to place a construction on the statutory definition which voided imputing to Congress an intent to discriminate between those whose opposition to war was based on an orthodox religion and those whose opposition was based on what we loosely refer to as unorthodox religious beliefs. The Supreme Court has told us in no uncertain terms that the exemption is not only for those whose opposition to war is based on an orthodox religion, but is also for those opposed to war because of a sincere and meaningful belief which in their life fills the same place as the belief in God fills in the life of an orthodox religionist.[8] If the Army's action in rejecting Gilliam's claim was pegged on the proposition that he was not a churchgoer, then that action would not only have violated the rule of *Seeger*, but it would also have violated the Due Process Clause of the Fifth Amendment, as well as the Free Exercise and Establishment Clauses of the First Amendment in that it would have rewarded church membership while discriminating against non-church membership. There is no issue here as to Gilliam's orthodoxy. He believed in God. He believed in the Ten Commandments. The only question as to his beliefs is whether, by reason of religious training and belief, he is conscientiously opposed to participation in war in any form. This is the threshold question of sincerity which must be resolved in every case. It is, of course, a question of fact—a prime consideration to the validity of every claim for exemption as a conscientious objector.[9] Objective facts are relevant only insofar as they help in determining the sincerity of the registrant in his claimed belief, purely a subjective question. In conscientious objector cases, any fact which casts doubt on the veracity of the registrant is relevant. Witmer v. United States, 348 U.S. 375, 75 S.Ct. 392, 99 L.Ed. 428. What are the facts? Gilliam registered for the draft and was given a questionnaire. When it came to the question concerning whether or not he considered himself a conscientious objector, he entered a notation in that space as follows: "Does not apply." He claimed exemption only when the time came for him to be issued a weapon. As soon as the Army was notified of his claim, his First Sergeant, Kunkle, initiated the paperwork for classification of Gilliam. After all questions were asked and the answers obtained, they were then typed and forwarded to Gilliam's company commander, who in turn

---

6. United States v. Seeger, 216 F.Supp. 516 (S.D.N.Y., 1963).

7. United States v. Seeger, 326 F.2d 846 (2nd Cir., 1964).

8. Constitutional law—religious belief necessary for conscientious objector exemption, La.Law Review, Vol. 26, p. 161.

9. Witmer v. United States, 348 U.S. 375, 75 S.Ct. 392, 99 L.Ed. 428; United States v. Seeger, 380 U.S. 163, at page 185, 85 S.Ct. 850, 13 L.Ed.2d 733.

counseled him as requested by Army Regulations. After counseling by the Commanding Officer, Gilliam then signed the statements and the paperwork was sent forward to the next chain of command. There is nothing that even remotely suggests that Gilliam received anything other than courteous and proper treatment. Gilliam was asked to try to get some substantiation of his claimed conscientious objector status, but such was never received, even though three weeks to a month was allotted for this purpose. Meanwhile, Gilliam was sent to a psychiatrist, Dr. Earl Short, who concluded that he was not a conscientious objector. The official diagnosis was:

"(3211) Passive-aggressive reaction, chronic, severe, manifested by inefficiency, procrastination, stubbornness, pouting, passive-obstructionism and impaired motivation for remaining in the Army. STRESS: Mild, routine military duties. PREDIS-POSITION: Severe. Long history of a character and behavior disorder. IMPAIRMENT FOR FURTHER MILITARY DUTY: Mild. LOD: . No, EPTS."

He was also sent to a Lt. Col. Duttweiler who personally interviewed Gilliam in an effort to understand his background and beliefs, and who after that interview could find nothing to substantiate Gilliam's case. Gilliam was also sent to Chaplain Kelso, Major, U. S. Army. After an interview, Chaplain Kelso came to the positive conclusion that Pvt. Gilliam was not sincere in his stated beliefs.

So it was that after a thorough study by the Army, and after they had afforded Gilliam every opportunity to substantiate his case, the request was forwarded to the Adjutant General of the Army. The Adjutant General then directed correspondence to the National Director of Selective Service, requesting an advisory opinion from the National Director concerning the request. This opinion was requested on November 26, 1965, and on January 6, 1966, General Hershey himself wrote that Gilliam would not be classified as a conscientious objector if he were being considered by his draft board at that time. General Hershey made no reference whatsoever to religion.

■ The basic facts are clear enough and a lengthy discussion of the detailed minutiae would serve only to divert attention to the questions before us: Was Gilliam's discharge denied because he did not belong to a church, or was it denied because the Army came to the conclusion that he was not sincere in his claimed belief? It is true that the Adjutant General did say that Gilliam was not a member of a religious organization, but also said *"and the evidence as presented does not warrant separation,"* (emphasis ours) and states further that in reaching his decision, consideration was given to the opinion of the Director of Selective Service [who never mentioned the words "religious sect" or "religion"] in his recommendation. Nothing in *Seeger,* or in any other case which has come to our attention, prohibits a fact-finder in endeavoring to ascertain the truth of one's religious belief—to ascertain during the truth-finding process whether or not a man belonged to a church. This would be a novel and paradoxical constitutional doctrine, and we reject it.

■ Our attention has not been directed to any reported case challenging a military denial of a discharge by a conscientious objector; but in our judgment, the scope for reviewing the action of a selective service board by habeas corpus is identical to that to be applied in reviewing the action of the Army. As Justice Clark said in *Witmer:* "It is well to remember that it is not for the courts to sit as super draft boards, substituting their judgments on the weight of the evidence for those of the designated agencies." Surely, under the facts of this case and the narrow scope of review given, we would not be justified in overturning the Army's refusal to grant the exemption. We hasten to add that the evidence substantiates the denial.

CONCLUSION

Gilliam is in the Army. His constitutional argument is pegged on the hy-

pothesis that the request was denied because Gilliam did not belong to a church or sect. We reject this hypotlesis as a fallacy. The totality of the evidence convinces us that the Army rejected the request for discharge because it concluded that Gilliam's professed "religious belief" was not truly held. It is appropriate in this connection to quote from Seeger, 380 U.S. 163, page 185, 85 S.Ct. 850, page 863:

"But we hasten to emphasize that while the 'truth' of a belief is not open to question, there remains the significant question whether it is 'truly held.' This is the threshold question of sincerity which must be resolved in every case. It is, of course, a question of fact—a prime consideration to the validity of every claim for exemption as a conscientious objector. The Act provides a comprehensive scheme for assisting the Appeal Boards in making this determination, placing at their service the facilities of the Department of Justice, including the Federal Bureau of Investigation and hearing officers. Finally, we would point out that in Estep v. United States, 327 U.S. 114 [66 S.Ct. 423, 90 L.Ed. 567] (1946), this Court held that:

" 'The provision making the decisions of the local boards "final" means to us that Congress chose not to give administrative action under this Act the customary scope of judicial review which obtains under other statutes. It means that the courts are not to weigh the evidence to determine whether the classification made by the local boards was justified. The decisions of the local boards made in conformity with the regulations are final even though they may be erroneous. The question of jurisdiction of the local board is reached only if there is no basis in fact for the classification which it gave the registrant.' At 122–123, 66 S.Ct. at 427."

For reasons aforesaid, the petition for habeas corpus is denied.